Barbara **MARINO**, M.D., Appellant

v.

Wendy **WILKINS**, Appellee.

No. 01–11–00835–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

March 8, 2012.

---

David James McTaggart, Lauren Held Harris, Wayne Clawater, Shepherd, Scott, Clawater & Houston, L.L.P., Houston, TX, for Appellant.

Iain G. Simpson, Simpson, P.C., John A. Davis Jr., Steven Ray Davis, Davis & Davis, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices HIGLEY and BROWN.

## OPINION

SHERRY RADACK, Chief Justice.

Plaintiff Wendy Wilkins sued defendant Barbara Marino, M.D., a gynecologist, for negligence and gross negligence, claiming that liposuction procedures Marino performed on Wilkins' arms and legs left her severely disfigured and that Marino's postoperative care was deficient. Wilkins timely served both an original and an amended expert report by Dr. Leo Lapuerta, a board certified plastic surgeon, under section 74.351 of the Texas Civil Practice and Remedies Code. Marino filed objections to both reports and moved to dismiss Wilkins's claims based on the reports' alleged deficiencies. Without reaching the merits of Marino's substantive arguments, the trial court denied her motion to dismiss because it concluded that Marino's failure to object to two theories of liability precluded dismissal.

Marino filed this interlocutory appeal challenging the trial court's order. She requests "the Court to reverse the denial of Dr. Marino's motion to dismiss." "In the alternative, Dr. Marino requests the Court to reverse the denial of Dr. Marino's motion to dismiss as to any theory of liability to which Dr. Marino's objections should have been sustained."

We affirm.

## BACKGROUND

Wilkins filed her original petition on September 13, 2010, alleging that Marino was negligent and grossly negligent in performing her liposuction procedure. Wilkins averred that Marino breached applicable medical standards of care during two July 2009 liposuction procedures performed on her arms and legs, causing "severe disfigurement and over resection of subcutaneous fat ..." Wilkins petition also states that Marino's failures "include, but are not limited to the failure to properly document the procedures, the failure to document a proper medical history, the failure to keep appropriate records; and the failure to properly perform the medical procedures on Ms. Wilkins." The petition further alleges that "[t]hese failures by Dr. Marino to properly care and treat Ms. Wilkins [are] breach[es] of the standard of care and such breach proximately caused severe, permanent and disabling injuries for which she now seeks recovery."

Lapuerta, the author of Wilkins's expert report, first examined Wilkins on November 14, 2009.[1] Wilkins told Lapuerta that Marino performed what is called "Smart-Lipo" surgery on her legs on July 1, 2008 and on her arms on July 9, 2008. Lapuerta observed that Wilkins "had numerous deformities of her extremities." Specifically, her "arms have very loose skin and they have been completely over resected in terms of liposuction with severe deformity and scalloping of the medial arm." Similarly, Lapuerta observed that Wilkins "has a severe loose skin and over resection of fatty tissue and from her medial and laterial posterior legs." Wilkins told Lapuerta

---

1. The medical records are not before us, and we accept the factual statements in Lapuerta's report for the limited purpose of this appeal. *Shenoy v. Jean*, No. 01–10–01116–CV, 2011 WL 6938538, at *1 (Tex.App.-Houston [1st Dist.] Dec. 29, 2011, pet. filed) (mem. op.) (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex.2002) (review of Chapter 74 report is limited to four corners of report)).

that she was unable to wear her clothes now and is very embarrassed by the appearance of her arms and legs.

Lapuerta ordered medical records from Marino. The records received in response did not contain any operative reports or preoperative records. Later Lapuerta received an email with preoperative pictures reflecting Wilkins had "excess skin laxity in her arms and lipodystrophy of the abdomen and thighs." Lapuerta's report states his observation that "[s]he certainly required a skin resection in her arms but underwent liposuction by Dr. Marino, who is a fellow of the American College of Obstetrics and Gynecology." According to Lapuerta, the "records are very vague and include numerous problems such as treatments that were never done on Ms. Wilkins," including "Lipo–Ex # 1" and "treatments of a complex radiation treatment device by Hillary Ybarra, M.E." Wilkins's family history contained in Marino's records "is also erroneous and states that [her] mother died at age 86, but Ms. Wilkins' mother is not deceased." The records further erroneously indicate she was treated for a complaint related to her surgery on a date that is a month before surgery.

The liposuction procedures on Wilkins's arms and legs are referenced on only one page of the medical records. That page states that the July 9, 2008 liposuction was preformed "using the ultrasonic liposuction as well as Smart Lipo and suction-assisted lipectomy with 700 cc removed from the left arm and 600 cc removed from the right arm." It also indicated that "[l]iposuction of the thighs [was] performed on July 1, 2008, using the same machines and approximately 3000 cc of fat was removed from each thigh." Post-operative, Marino's records indicate that she prescribed mesotherapy, lipodisssolve, and "lipo ex treatment." Lapuerta also notes that

Marino appears to have treated Wilkins with "Vela Shape" and instructed her to use "body of knowledge cream to facilitate healing."

## A. The First Report

On January 10, 2011, Wilkins timely filed an expert report by Lapuerta. In addition to setting forth the background facts detailed above, Lapuerta's report set forth his education and qualifications, including that he is "board certified by the American Board of Plastic Surgery and the American Board of Surgery," "maintain[s] an active practice in plastic surgery" and "is familiar with liposuction techniques and treatment." He regularly sees liposuction patients as a part of his practice and his report avers that he is "familiar with the standards of care applicable to such treatment." The first report also contains the following sections addressing the standard of care, breaches, causation, and his conclusions:

*Standard of Care*

1. The standard of care for liposuction procedures require qualified and experienced plastic surgeons.

2. In addition, the standard of care calls for liposuction procedures to be approached conservatively. That is, when any doubt exists as to the extent of resection to be performed, the surgeon should err on the side of caution—resecting less tissue than might ultimately be called for—in order to avoid taking out too much. It is always easier to go back and take more fat out than to perform actions that will require major corrective surgery later on. The standard of care calls for a surgeon to be prepared to go back and resect additional tissue rather than over-resect in a first surgery.

3. The standard of care also calls for the use of compressive bandages and

girdles to alleviate swelling in the post-operative period.

*Breaches of Standard of Care*

1. I have grave doubts about Dr. Marino's qualifications to perform liposuction procedures. I do not know of any accredited hospital or outpatient surgical facility that would allow an OB/GYN physician to perform liposuction. It does not appear that she has any certification in plastic surgery or any particular experience in that area. Under the circumstances, her mere performance of this procedure was a breach of the standard of care.

2. Dr. Marino breached the standard of care by over resecting fatty tissue from Ms. Wilkins['] arms and legs. She failed to take an appropriately conservative approach to the procedure and, consequently, she simply took out too much. Both her approach to the procedure—aggressively resecting tissues in a single procedure—and her ultimate performance of that procedure were breaches of the standard of care.

3. Dr. Marino breached the standard of care in her post-operative care of Ms. Wilkins by failing to prescribe the use of compressive bandages and girdles and, instead, prescribed mesotherapy, lipodissolve, and some type of "lipo ex treatment." While I am uncertain of exactly what the latter consists, it is most definitely not in line with the standard of care.

*Causation*

In summary, Ms. Wendy Wilkins has severe disfigurement and over resection of subcutaneous fat from "Smart Lipo" procedures performed by Dr. Marino in July of 2008. The over resection was itself a breach of the standard of care and, I believe, resulted from the performance of the liposuction procedure by an unqualified surgeon. Post operative treatment with mesotherapy and some type of Vela Shape have not corrected this over resection and was also a breach of the standard of care. In my 22 years of medical practice, I have not seen this extent of over resection of subcutaneous fat in the arms and legs. I believe Ms, Wilkins has some severe permanent disfigurement directly resulting from these procedures. In the future, Ms. Wilkins will require numerous corrective procedures to correct the mentioned deformities. To address the arms, she will need bilateral brachioplasties followed by fat grafting. To correct the over resection of the lower leg, she will require a circumferential body lift procedure and a medial thigh lift with fat grafting post-operatively.

I have additional concerns about Dr. Marino's recordkeeping in her treatment of Ms. Wilkins. Dr. Marino performed two separate surgeries, although standard practice would call for a single surgical procedure involving treatment of both the arms and legs. It is unclear from the records I have reviewed why this was done, what type of anesthesia was used, whether there was an anesthesiologist/CRNA in the room, or where exactly these procedures were performed. As noted above, I do not know of any accredited hospital or outpatient surgical facility that would allow an OB/GYN to perform liposuction. While recordkeeping issues did not cause Ms. Wilkins' damages, they are another breach of applicable standards and raise questions about the treatment she received.

Finally, I am concerned that an obstetrician and gynecologist who is not a qualified plastic surgeon is performing plastic surgery and body contouring on patients. This may be dangerous to other

people in the community, and she may not be operating at an approved ambulatory surgery center by the State of Texas. I believe that this requires further investigation.

*Conclusion*

In my opinion, this treatment of Ms. Wendy Wilkins violates the standard of care in the community in numerous breaches in the standard of care such as a gynecologist performing body contouring at weekly intervals on the patients. The postoperative therapy is also a breach on the standard of care. These breaches caused the aforementioned damages to Ms. Wilkins and will require extensive additional treatment to correct, where correction is possible, at all.

**B. Marino's objections to the first report**

Marino timely objected to the report within sixteen days of being served, advancing three arguments about why the report was deficient. *See* Tex. Civ. Prac. & Rem.Code § 74.351(a) (Vernon 2011) (providing defendant 21 days to serve objections to sufficiency of expert report).

*Lapuerta's Qualifications.* First, Marino contended that Lapuerta was not qualified to render an opinion because "the report fails to establish Dr. Lapuerta's familiarity with the procedures involved." She notes that the "report does not establish that Dr. Lapuerta has any expertise or expertise with the procedures in question, Smart Lipo, Lipo ex, and mesotherapy."

*Standard of Care.* Marino next complains that Lapuerta's report is too conclusory in its description of the conservative approach. Specifically, Marino notes that his report "contains no specifics with respect to precisely how much fatty tissue should be removed, how a doctor makes the determination of the amount of fatty tissue to remove, or the actual amount of

fatty tissue removed by Defendants in this case." According to Marino, the report "does not constitute a fair summary of Dr. Lapuerta's opinion's because, while it is "apparent that Dr. Lapuerta believes that Defendant removed too much fatty tissue and was therefore negligent," he "provides no specifics to explain this criticism, for example, the appropriate amount of fat to remove or how one goes about ensuring that too much fat is not removed."

*Third Objection:* Marino lodges a third objection that does not speak specifically to standards of care, breach or causation, but appears to relate to the above two objections. She notes that Lapuerta's report admits that he does not know what "Lipo ex treatment" is and that "even though he is not familiar with the treatment, he is confident that it is not within the standard of care." She asserts that "[t]his criticism by Dr. Lapuerta demonstrates his apparent lack of experience/expertise and the conclusory nature of his opinion."

**C. Wilkins's response and Lapuerta's amended report**

Wilkins responded to Marino's objections and requested a 30–day extension to file an amended report. She argued that Lapuerta's report adequately "set forth his qualifications and familiarity with the subject matter liposuction." She also argued that both the standards of care and Lapuerta's opinion about why the standards were breached were adequately specific.

Wilkins additionally contended that by only objecting to one of the three standards of care set forth in Lapuerta's report—i.e., using a conservative approach to determine the amount of tissue to resect in one surgery—during during the 21–day window provided by section 74.351(a), Marino has waived any complaint concerning the adequacy of the other two stan-

dards, i.e., calling for liposuction procedures to be performed by qualified and experienced plastic surgeons, and calling for the post-operative use of compressive bandages and girdles.

After a hearing, the trial court granted a 30–day extension for Wilkins to cure any deficiencies within the report. On July 27, 2011, Wilkins timely filed an amended report, which added the following underlined elaboration of the operative standard of care Marino should have used:

2. In addition, the standard of care calls for liposuction procedures to be approached conservatively. That is, when any doubt exists as to the extent of resection to be performed, the surgeon should err on the side of caution— resecting less tissue than might ultimately be called for—in order to avoid taking out too much. It is always easier to go back and take more fat out than to perform actions that will require major corrective surgery later on. The standard of care calls for a surgeon to be prepared to go back and resect additional tissue rather than over-resect in a first surgery. *If necessary the surgeon should perform multiple procedures, rather than attempting to complete all necessary liposuction in a single treatment. By taking a conservative approach, the surgeon guards against the possibility of over-resection. This also allows the surgeon to see the end appearance of a first procedure before embarking upon a second or subsequent one-Setting out to perform a procedure with a particular amount of percentage of tissue to resect is not within the standard of care because it can lead to over-resection. The decision of how much to resect must be made with "eyes on the ground" in the course of the procedure itself. It is a judgment that will vary from patient to patient. The constant, however—and the standard of care—is a conservative approach to the procedure.*

The rest of the report remained the unchanged.

Marino again filed objections and moved to dismiss this amended report. As in her previous objections, Marino contended the operative standard of care articulated in Dr. Lapuerta's report still lacked sufficient specificity. She argues that Lapuerta does nothing more than suggest a standard of care of "exercise[ing] good judgment and resect[ing] an appropriate amount of tissue." Thus, according to Marino, the "report completely fails to state any objective standard to apply to surgeons carrying out this procedure as Chapter 74 requires."

Marino also—for the first time—directly attacked other theories that were first included in Lapuerta's initial report and which remained unchanged in the amended report, which relate to Marino's alleged lack of qualifications to perform liposuction, failure to prescribe proper postoperative treatment, and failure to maintain appropriate recordkeeping:

The amended report also contains broad statements that the standard of care was breached by Defendant's alleged lack of qualifications to perform surgery, the postoperative misuse of bandages and girdles, and the quality of record keeping. The report does not state that these alleged breaches caused injury to Plaintiff. In fact, the report even explicitly states that record keeping did not cause any injury to Plaintiff. The report fails to state what specific qualifications are required. The report fails to provide any detail about the type of postoperative bandages that should be used or the length of time they should be applied. Defendant objects to these allegations because they are impermissi-

bly vague and conclusory and because there is no statement that these alleged breaches caused any injury.

### D. The trial court's order

After hearing objections to Lapuerta's supplemental expert report, the trial court concluded that Marino waived her objections to two theories by failing to timely raise pursuant to Section 74.351(a) and, thus, declined to address Marino's objection that the "conservative approach" standard of care was too vague. It explained in its order:

> Whether the Court would or would not sustain the objections to the 'conservative approach' theory of liability is irrelevant. The plaintiff also included two other theories of liability to which defendant never filed objections. Therefore, the case may go forward and is not dismissed. This is true whether the Court sustained or overruled the objection regarding 'conservative approach' theories of liability. Thus, defendant's motion is denied.

Marino timely filed this interlocutory appeal challenging that denial of her motion to dismiss. *See* TEX. CIV. PRAC. & REM.CODE § 51.014(a)(9) (Vernon 2008).

### APPLICABLE LAW

### A. Standard of Review

 A trial court's ruling on a motion to dismiss a health care liability claim is reviewed for clear abuse of discretion. *See Bowie Mem. Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (per curiam); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001); *see also Kendrick v. Garcia,* 171 S.W.3d 698, 702–03 (Tex.App.-Eastland 2005, pet. denied) (utilizing *Palacios'* abuse-of-discretion standard to review denial of a motion to dismiss under Section 74.351). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Kendrick,* 171 S.W.3d at 703 (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)). There is no abuse, however, simply because a trial court may decide a matter within its discretion differently than an appellate court would. *Downer,* 701 S.W.2d at 242. Thus, when reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for that of the trial court. *Wright,* 79 S.W.3d at 52.

### B. Texas Civil Practice and Remedies Code § 74.351

Chapter 74 of the Civil Practice and Remedies Code requires a claimant pursuing a health care liability claim to serve one or more expert reports, with a curriculum of their experts, on each party no later than 120 days after the original petition is filed. TEX. CIV. PRAC. & REM.CODE. ANN. § 74.351(a) (Vernon 2011). The report must provide a fair summary of the expert's opinions regarding (1) the applicable standards of care; (2) the manner in which the care provided failed to meet that standard; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6); *Jelinek v. Casas,* 328 S.W.3d 526, 540 (Tex. 2010) ("[T]he plaintiff need not marshal all of his proof in the [expert] report, but he must include sufficient detail to allow the trial court to determine if the claim has merit.").

 The phrase "has not been served" in section 74.351 refers to deficient reports as well as absent reports. *Compare* § 74.351(b) (trial court shall dismiss if an expert report "has not been served") *with* § 74.351(c) (trial court may grant a 30–day extension if an expert report "has not been served ... because elements of the report are found deficient"). The consequences

arising from failure to serve an expert report regarding a particular defendant and service of a deficient expert report are nonetheless different. *See Ogletree v. Matthews*, 262 S.W.3d 316, 319–21 (Tex. 2007) ("[A] deficient report differs from an absent report.").

If the claimant fails to serve an expert report as to a particular health care provider within 120 days, the trial court must, on the health care provider's motion, dismiss the claim against that provider with prejudice and award the provider reasonable attorney's fees and costs. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b). On the other hand, if a timely-served report implicates a particular defendant's conduct, the defendant must file and serve "any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived." *Id.* § 74.351(a); *Poland v. Grigore*, 249 S.W.3d 607, 616 (Tex. App.-Houston [1st Dist.] 2001, no pet.). If valid objections have been timely asserted, dismissal is not required. *See Ogletree*, 262 S.W.3d at 319–21. Instead, the court may grant a single 30–day extension to cure any deficiency. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c). "A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the statutory definition of an expert report." *Id.* § 74.351(*l*).

## THE PARTIES' ARGUMENTS

Marino appeals the denial of her motion to dismiss in two issues, requesting that we reverse and render judgment dismissing Wilkins's case with prejudice or, alternatively, that we render judgment dismissing some of Wilkins's claims with prejudice:

(1) Wilkins' health care liability claim should be dismissed because Dr. Lapuerta's amended expert report failed to set forth an objective standard of care for the "conservative approach" and for Wilkins' postoperative care.

(2) Wilkins' health care liability claim based on any nonmeritorious theory of liability should be dismissed.

In response, Wilkins asserts that Marino is asking the Court to reverse a substantive holding that the trial court never made. Wilkins notes that the trial court expressly declined to address the adequacy of Lapuerta's report because it held that Marino waived objections to the report by failing to object to two of three advanced theories of liability. She urges us to restrict our consideration to that waiver issue and hold that the trial court correctly determined that (1) Marino waived her objection to at least one liability theory in Lapuerta's report by failing to object in response to Lapuerta's original report, and (2) under this Court's decision in *Certified EMS, Inc. v. Potts*, 355 S.W.3d 683 (Tex. App.-Houston [1st Dist.] 2011, pet. filed), Wilkins's entire case can proceed because there is at least one liability theory within a cause of action Marino did not object to. Finally, Wilkins asserts that her report was substantively adequate, which she argues precludes the relief Marino requests if the Court decides to address this issue in the first instance, despite the trial court not having reached it.

## ANALYSIS

The trial court expressly declined to address the substance of Marino's objections because it concluded that (1) Marino failed to object to all the theories advanced in Lapuerta's report, and (2) Wilkins's entire case could move forward if there was an unobjected-to theory in Lapuerta's report.

Because it was the basis of the trial court's denial of Marino's motion to dismiss, we begin with the question of whether *Potts* supports denial of Marino's motion to dismiss if Marino did not timely object to all of Wilkins's theories of liability.

### A. *Certified EMS v. Potts*

In *Potts,* the plaintiff sued complaining of a male nurse's inappropriate sexual conduct during a hospital stay. 355 S.W.3d at 685–86. It was later discovered that the nurse, Les Hardin, was not an employee of the hospital, but instead employed by Certified EMS, a nurse-staffing agency. *Id.* at 686. Potts sued Certified EMS "asserting that it was vicariously liable for Hardin's conduct under a respondeat superior theory and directly liable for its own negligence in training and supervising Hardin." *Id.*

Potts served her expert reports under section 74.351, and Certified EMS objected to the reports and sought dismissal. *Id.* After the trial court denied the motion to dismiss, Certified EMS brought an interlocutory appeal to this Court. *Id.* at 685, 687–88. In reviewing the sufficiency of Potts's reports and Certified EMS's objections, we determined that the experts' reports adequately supported "Potts's theory that Certified EMS is vicariously liable under the doctrine of respondeat superior," but did not support her claim that "Certified EMS might be directly liable for its own conduct." *Id.* at 687.

We framed the issue presented as "whether the expert report must address both vicarious and direct liability theories for both theories to move past the expert report stage or whether a report adequate as to one of those theories is sufficient for the entire cause of action to move to the next stage." *Id.* at 690. To resolve that question, we looked to "(1) the law concerning construction of a statute, (2) the plain language of the statute, (3) the objectives of the legislation and consequences of the construction of the statute, and (4) the conflict in the existing case law." *Id.*

After analyzing each, we concluded that "if the claimant timely serves an expert report that adequately addresses at least one liability theory against a defendant health care provider, the suit can proceed, including discovery, without the need for every liability theory to be addressed in the report." *Id.* at 693 (citing *Baylor Coll. of Med. v. Pokluda,* 283 S.W.3d 110, 123 n. 3 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (explaining that dismissal of health care liability claim was not warranted because expert report satisfied section 74.351(r)(6)'s requirement with respect to alleged deviation from standard of care during surgery "regardless of whether [the] report also satisfies section 74.351(r)(6)'s requirements with respect to [doctor's] alleged deviations from standard of care before surgery.")).[2]

Marino contends that *Potts* is factually distinguishable from this case because the expert in *Potts* "made no attempt to address the direct liability theory of recovery." Thus, Marino reasons, the trial court in *Potts* "necessarily treated the direct liability claim as if it had been discovered later and added in an amended petition," such that the court was "given no opportunity to evaluate the adequacy of the reports as to the direct liability

**2.** In doing so, we recognized that the "[i]ntermediate courts of appeals are split concerning whether an expert report adequate as to at least one liability theory within a cause of action is sufficient to permit other liability theories within the same cause of action to proceed although the expert report is deficient with respect to the other theories," and that the supreme court has not yet addressed the issue. *Potts,* 355 S.W.3d at 695. A petition for review in *Potts* has been filed in the supreme court.

claims." In contrast, "the reports in this case were not silent as to one or more theories of recovery," so the court "was given the opportunity to evaluate the adequacy of the reports with respect to all theories of recovery." Accordingly, Marino argues, the "case should not be allowed to proceed on the theories that were not properly addressed by the expert reports because they are clearly nonmeritorious theories of liability."

Wilkins responds that such a distinction is not supported by *Potts*, and asserts that "it would be a curious rule that punished a plaintiff for presenting in an expert report all—or at least, more than one-of the liability theories that she intended to rely on at trial while potentially rewarding her for 'hiding the ball.'"

**B. Under *Potts*, the trial court's denial of Marino's motion was proper if there is at least one unobjected-to theory of liability.**

■ We agree with Wilkins that *Potts* supports denial of a motion to dismiss if at least one valid liability theory is included in an expert report. In *Potts*, we recognized a distinction between theories of liability and causes of action in the context of healthcare liability claims. *Potts*, 355 S.W.3d at 691–92. We noted that the supreme court had described a cause of action as "a fact or facts entitling one to institute and maintain an action, which must be proved to order to obtain relief," and as a "group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person." *Id.* at 691 (quoting *In re Jorden*, 249 S.W.3d 416, 421 (Tex.2008)).

We concluded that the plain language of section 74.351 focuses "on a cause of action, rather than particular liability theories that may be contained within a cause of action," such that it "does not require an expert report to set out each and every liability theory that might be pursued by the claimant as long as at least one liability theory within a cause of action is shown by the expert report." *Id.* at 691. Consequently, we held that an entire cause of action, or claim, must be dismissed when the expert report fails to set "out at least one liability theory within a cause of action." *Id.* But if there is "at least one liability theory within a cause of action shown by the expert report," the entire case can move forward, including later-added theories, so long as the "additional theory arises out of the same group of operative facts set forth in the expert report and is asserted against the same defendant." *Id.* at 692, 694.

We decided this interpretation was most consistent with the legislative intent. Recognizing that an expert report is simply a pre-discovery threshold "over which a claimant must proceed to continue a lawsuit," we noted its two purposes: "(1) to inform the defendant of the specific conduct the claimant is questioning, and (2) to provide a basis for the trial court to conclude that the claim has merit." *Id.* at 692 (quoting *Leland v. Brandal*, 257 S.W.3d 204, 206–07 (Tex.2008)). "Once the expert report requirement is met, the gate-keeping purpose has been achieved, and the claimant's case may proceed, including full discovery." *Id.*

Certified EMS filed a motion for rehearing in *Potts* arguing, as Marino does here, that the trial court should (1) evaluate each liability theory within a cause of action, (2) make a determination at the expert-report stage about whether that theory, as presented in the report, is meritorious, and (3) dismiss any liability theory within a cause of action that is not adequately set out in the report, while allowing other liability theories within that same cause of action

to move forward. *Id.* at 696–97. We considered and rejected that argument, concluding that it was not consistent with rule 74.351's language or its purpose:

> If we were to narrowly construe the word "claim" to mean a particular liability theory—rather than the group of operative facts giving rise to one or more basis for suing—the dismissal contemplated by section 74.351(b) would require dismissal with prejudice only as to that particular theory. This is contrary to the intent of the statute to dismiss early a defendant from a lawsuit. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b)
>
> . . . .
>
> Because the intent of the Legislature is to require the early dismissal of the entire cause of action from frivolous lawsuits filed against defendants, we are unpersuaded by Certified EMS's argument that our decision would allow a plaintiff, after the expert report filing stage, to later dismiss vicarious liability theories and pursue direct liability theories never presented in an expert report. As we have noted above, the purpose of the expert report is to serve as a gatekeeper that allows nonfrivolous causes of action against a defendant to move forward past an initial stage so that full discovery concerning the lawsuit may take place. After full discovery has taken place, a plaintiff's approach to a lawsuit might vary from its initial approach, which is permitted under the expert report statute, as long as the liability theories underlie the same cause of action. *See In re Jorden,* 249 S.W.3d at 421 (explaining that "health care liability claim" includes potential claims not yet filed).

*Id.* at 693–94.

Under *Potts,* the trial court correctly concluded that if Marino did not timely object to at least one theory of liability in Lapuerta's report, Marino's motion to dismiss should be denied. We thus overrule Marino's second issue.

## SCOPE OF MARINO'S OBJECTIONS

We now address Marino's argument that the trial court's conclusion that Marino failed to object to at least one theory of liability is erroneous. To do so, we must determine which objections were timely and before the trial court when it denied Marino's second motion to dismiss—the decision that is the subject of this appeal.

Lapuerta's original report included:

(1) his qualifications;

(2) three standards of care-(a) surgery by a qualified plastic surgeon, (b) conservative approach to resection, and (3) postoperative use of bandages and girdles;

(3) three breaches of the standard of care—(a) performance of liposuction by unqualified and inexperienced doctor, (b) failure to take a conservative approach to resection, and (c) postoperative failure to prescribe compressive bandages and girdles;

(4) causation—these breaches caused Wilkins' damages, and will require extensive additional treatment to correct, if even possible.

Marino's objections to this report were (1) that Lapuerta is not qualified because the report did not establish that Lapuerta had experience or expertise with Smart Lipo, Lipo ex, and mesotherapy, and, further, that Lapuerta's admission that he is not familiar with Lipo ex demonstrates his apparent lack of experience and the conclusory nature of his opinion, and (2) that Lapuerta's conservative approach is too vague and conclusory because it does not explain how much fatty tissue should be removed, or how that is determined.

In response, Lapuerta prepared an amended expert report that expanded on his description of the conservative approach in the standards of care section. The remainder of the report remained unchanged.

Marino's objections and second motion to dismiss: (1) repeat the objection that the "conservative approach" standard of care does not sufficiently describe any objective standard of care, (2) added objections to Lapuerta's opinion that Marino lacked qualifications to perform liposuction surgery and to the allegation that she should have used of bandages and girdles post-operation, arguing that these are "impermissibly vague and conclusory and . . . there is no statement that these breaches caused any injury," and (3) dropped the objection that Lapuerta is unqualified.

### A. Which Objections Matter?

Marino's arguments in her brief rely on (1) objections made only to the Lapuerta's initial report, (2) objections made only to the amended report, and (3) objections that remained similar or unchanged in both.

Wilkins argues that the objections made only in response to Lapuerta's initial report, but not repeated in response to the amended report, are waived. *See Gordon v. Sebile,* 311 S.W.3d 190, 193 (Tex.App.-Beaumont 2010, no pet.). We agree. *See Otero v. Leon,* 319 S.W.3d 195, 204–05 (Tex.App.-El Paso 2010, pet. denied) (holding objections lodged at first report were waived because defendants did not object to amended report served after trial court granted 30–day extension to cure any deficiencies in report); *Gordon,* 311 S.W.3d at 193 (defendant who objected to initial expert's report was required to object, within 21 days, to expert's second report to avoid waiving objections to that report, even if second report added only inconsequential references to physician standards and only

material change applied to a different defendant).

■ Indeed, we lack jurisdiction over a trial court's decision overruling objections to an initial report if the trial court grants a 30–day extension to file a new report. *Ogletree,* 262 S.W.3d at 321 ("[I]f a deficient report is served and the trial court grants a thirty day extension, that decision—even if coupled with a denial of a motion to dismiss—is not subject to appellate review."); *Potts,* 355 S.W.3d at 690 ("Because the trial court granted an extension of time to cure deficiencies in the reports originally filed by Potts, we lack jurisdiction over Certified EMS's appeal of the denial of its first motion to dismiss."). Marino's arguments here that are predicated on her objections to the initial report and not repeated in her objections to the amended report are waived.

■ Wilkins further argues that new objections to Lapuerta's amended report that were not made to identical language in the initial report were waived by the failure to make those objections within 21 days of service of the initial report:

> [T]he mere service of an amended report—one that changes nothing about previously unobjectionable recitations—cannot provide a defendant a second bite at the apple. Dr. Marino does not get a renewed opportunity to object to previously unobjected-to standards. . . . Indeed, the entire purpose of requiring timely objection would be defeated by allowing a defendant to raise new objections to an expert's original statements after the plaintiff has already used his or her one opportunity to provide an amended report.

This argument appears to present an issue of first impression. We are persuaded, however, that the plain language of section 74.351, as well as the purpose be-

hind it and the consequences flowing from the potential interpretations support finding that new objections made to sections in the amended report that remained unchanged from the initial report are waived.

In construing a statute, the Court's primary goal is to ascertain and give effect to the Legislature's intent in enacting it. *In re Canales,* 52 S.W.3d 698, 702 (Tex.2001). The Legislature's intent is derived by examining the language used in the statute within the context of the entire statute. *Upjohn Co. v. Rylander,* 38 S.W.3d 600, 607 (Tex.App.-Austin 2000, pet. denied). If a statute is clear and unambiguous, we need not resort to rules of construction or other aids to construe it. *Id.* Even then, however, we may consider, among other things, the statute's objectives and the consequences of a particular construction. *See* TEX. GOV'T CODE § 311.023 (Vernon 2008); *In re Canales,* 52 S.W.3d at 702.

We are concerned with the interplay between three subsections of section 74.351. They provide, in relevant part:

*Timing for objections.* "Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, *failing which all objections are waived.*"

§ 74.351(a) (emphasis added).

*Purpose of extension of time.* " "If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant *one 30–day extension to the claimant in order to cure the deficiency.*

§ 74.351(c) (emphasis added).

*Consequence of sustained objection.* "If as to a defendant physician or health care provider, an expert report has not been [timely] served ..., the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that: (1) awards to the affected physician or health care provider reasonable attorney's fees and costs ...; and (2) *dismisses the claim with respect to the physician or health care provider, with prejudice to the refilling of the claim.* § 74.351(b) (emphasis added).

In *Potts,* we recognized section 74.351(a)'s purpose is to provide pre-discovery tool to inform the defendant about the specific conduct making up the plaintiff's complaint and provide the trial court a basis to conclude the claim has merit to proceed. *Potts,* 355 S.W.3d at 692. In other words, it serves as a "gate-keeper," *TTHR, L.P. v. Guyden,* 326 S.W.3d 316, 319 (Tex.App.-Houston [1st Dist.] 2010, no pet.), establishing a preliminary "threshold over which a claimant must proceed to continue a lawsuit." *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005).

By its plain language, section 74.351(a) provides that objections not presented within 21 days after service of a 74.351 report are waived. Tex. Civ. Prac. & Rem.Code § 74.351(a). The consequence of a waived objection at this stage is that the plaintiff's case is allowed to proceed as any other case, reserving the trial court's consideration of the merits of plaintiff's claims until summary judgment or trial.

Section 74.351(c) empowers the trial court to grant "one 30–day extension" to cure any deficiencies found by the trial court in the initial report. Implicit in this scheme, the trial court finds deficiencies in an expert report only in response to timely filed objections by the defendant, as the trial court is not empowered to dismiss a plaintiff's case for lack of a sufficient Chapter 74 expert report except "on motion of the affected physician or health care provider." TEX. CIV. PRAC. & REM.CODE

§ 74.351(b). The supreme court has admonished that "[t]he trial court should err on the side of granting the additional time and *must* grant it if the deficiencies are curable." *Scoresby v. Santillan,* 346 S.W.3d 546, 549 (Tex.2011) (emphasis added). The statutory scheme thus contemplates a safety-net for plaintiffs in which they are given one opportunity to cure deficiencies pointed out in their expert report before their claims are dismissed with prejudice.

Permitting defendants to remain silent about a particular complaint when objecting to an initial report and then raise that objection in response to an amended report containing the same recitations as an earlier report would thwart the plaintiff's opportunity to cure that deficiency because the trial court is not empowered to grant another extension of time to cure the objected-to deficiency. The consequence of that interpretation is dismissal of a plaintiff's claim with prejudice without the plaintiff being afforded the opportunity to cure a curable deficiency that is not only contemplated, but required, by section 74.351(c). *Scoresby,* 346 S.W.3d at 549

(extension required if deficiency is curable).[3]

For these reasons, we hold that a defendant may not raise new objections to recitations repeated in an amended report from the initial report if the defendant did not properly raise those objections within twenty-one days of the initial report. Such objections are waived.

**B. The trial court did not abuse its discretion by concluding that Marino's objections to the portion of Lapuerta's report complaining of postoperative care was waived.**

One of two theories of liability that the trial court concluded that Marino failed to object to is that Marino's post-operative care breached the relevant standard of care and that contributed to Wilkins's injury. Lapuerta's initial report and amended report contain identical recitations regarding Marina's post-operative care.

> *Standard of Care section:* "The standard of care also calls for the use of compressive bandages and girdles to alleviate swelling in the postoperative period."

---

**3.** Our resolution of this issue is consistent with the Fourteenth Court of Appeals' recent analysis of a similar issue. In *Neason v. Buckner,* the plaintiff served the defendant doctor with its expert report along with its petition. 352 S.W.3d 254, 256 (Tex.App.-Houston [14th Dist.] 2011, no pet.). More than twenty-one days after service of this report, the defendant sought dismissal of three of plaintiffs' claims, arguing that, although pleaded, they were not even mentioned in the expert report. *Id.* The trial court agreed, granted the defendant's objections, and granted the plaintiff a 30–day extension to file an amended report to cure the deficiencies. *Id.* After the plaintiff filed a timely supplemental expert report, the defendant again moved to dismiss the same three claims. *Id.* The trial court denied the motion to dismiss, and the defendant appealed. *Id.* The court of appeals did not reach the substance of the objections

to the three claims, instead agreeing with the plaintiff that because the defendant waived all objections to the original report by failing to timely object, objections to the supplemental report were also waived. *Id.* at 259. The court held that because the defendant had waived objections to the initial report, "the trial court's order to the plaintiff to cure the report's deficiencies is 'superfluous and procedurally inconsequential.'" *Id.; see also Binzer v. Alvey,* 359 S.W.3d 364, 366–67 (Tex. App.-Fort Worth 2012, no pet. h.) (expressly adopting *Neason's,* reasoning). Although the trial court here did not specify the grounds for sustaining Marino's objections to Lapuerta's initial report and granting a 30–day cure period, based on *Neason's,* reasoning, Marino's new and additional objections to Lapuerta's report (that could have been timely raised in response to the initial report, but were not), were waived.

*Breaches of Standard of Care section:* "Dr. Marino breached the standard of care in her post-operative care of Ms. Wilkins by failing to prescribe the use of compressive bandages and girdles and, instead, prescribed mesotherapy, lipodissolve, and some type of 'lipo ex treatment.' While I am uncertain of exactly what the latter consists, it is most definitely not in line with the standard of care."

*Causation section:* "Post operative treatment with mesotherapy and some type of Vela Shape have not corrected this over resection and was also a breach of the standard of care."

*Conclusion section:* "In my opinion, this treatment of Ms, Wendy Wilkins violates the standard of care in the community in numerous breaches in the standard of care such as a gynecologist performing body contouring at weekly intervals on the patients. The postoperative therapy is also a breach on the standard of care. These breaches caused the aforementioned damages to Ms. Wilkins and will require extensive additional treatment to correct, where correction is possible, at all.

Marino in her brief here contends that "Wilkins' argument and the trial court's order stating that Dr. Marino failed to object to the part of the report criticizing her postoperative care are wrong." In support, she first contends that her "initial objections clearly state that Dr. Lapuerta's criticism of Dr. Marino's postoperative care is conclusory, as follows:"

Defendant objects to the report of Dr. Lapuerta for the following reasons.

. . .

Dr. Lapuerta states that Defendant was negligent for prescribing mesotherapy, lipodissolve, and "some type of lipo ex treatment." Dr. Lapuerta even states that he does not know what the latter consists of, but he concludes it is most definitely not in line with the standard of care. In other words, Dr. Lapuerta is saying that, even though he is not familiar with the treatment, he is confident that it is not within the standard of care. This criticism by Dr. Lapuerta demonstrates his apparent lack of experience/expertise and the conclusory nature of his opinion.

Marino acknowledges that this objection did not result in any change in Lapuerta's discussion of the Marino's postoperation care in his amended report—the language remained identical. She asserts though that her objections to the amended report again adequately objected to Lapuerta's opinions about post-operative care:

The amended report also contains broad statements that the standard of care was breached by Defendant's alleged . . . postoperative misuse of bandages and girdles. . . . The report fails to provide any detail about the type of postoperative bandages that should be used or the length of time they should be applied. Defendant objects to these allegations because they are impermissibly vague and conclusory and because there is no statement that these alleged breaches caused any injury.

According to Marino, any "contention that Dr. Marino failed to make known her objections to Dr. Lapuerta's reports as they pertain to her postoperative care is without merit."

In addition, she contends that "Wilkins' waiver argument misunderstands the specific statutory element that Dr. Marino contends was lacking in Dr. Lapuerta's reports." She asserts that her objections were to Lapuerta's opinion that "Dr. Marino's postoperative care *breached* the standard of care." Wilkins's waiver argument, according to Marino, focuses instead on the standard of care element.

Wilkins responds that Marino's objections to the initial report cannot be fairly read to have conveyed to the trial court the arguments that Marino now makes on appeal. She argues that the "requirement of prompt objection exists to inform both the Court and the plaintiff of the nature and substance of a defendant's complaints," and that when the objection "is so vague that it fails to identify any required element that is lacking in the expert report—the goals of § 74.351(a) are not served" because the court "receives no guidance as to what information the defendant claims to lack, and the plaintiff receives no information concerning where any deficiency lies."

Wilkins also points out that Marino's argument that she objected to "the breach of the standard of care section" is unsupported by the actual language of the objection and, in any event, that objection she relies upon was made only in the objection to the initial report, not the amended report. Finally, Wilkins asserts that "what was raised by objection is itself a factual determination for the trial court to make and one that this Court may not disturb absent manifest abuse of discretion." *Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41–42 (Tex.1989).

The trial court did not abuse its discretion by finding that Marino did not timely object to Lapuerta's opinions related to Wilkins's theory of liability complaining that Morino breached a standard of postoperative care. Marino's objection related to postoperative care in response to Lapuerta's initial report—i.e., that the postoperative care "criticism by Dr. Lapuerta demonstrates his apparent lack of experience/expertise and the conclusory nature of his opinion"—is couched in terms of Lapuerta's alleged lack of qualifications to opine about postoperative care.[4] Marino's objections to Lapuerta's identical opinions about Marino's postoperative care in his amended report are that they "are impermissibly vague, and conclusory and ... there is no statement that these alleged breaches caused any injury."

█ Notwithstanding the use of the word "conclusory" in both objections, we hold that the trial court could have concluded that the objections related to Lapuerta's opinions about Wilkins's postoperative care in response to the amended report were new and thus waived as untimely. The context of the "conclusory" complaint in Marino's objections to the initial report, i.e., appended to an argument that Lapuerta's lack of familiarity with a postoperative procedure rendered him unqualified, is different than the context of the "conclusory" complaint in the objections to the amended report, i.e., related to (1) Lapuerta's failure to opine about specific type of postoperative band-

---

4. Marino's objections to Lapuerta's qualifications were abandoned in her objections to Lapuerta's amended report. In the argument section of her brief, Marino nonetheless argues that Lapuerta's amended expert report is "fatally deficient because Dr. Lapuerta does not establish that he has any expertise or experience with the specific liposuction techniques in question." She notes that she objected to Dr. "Lapuerta's lack of expertise regarding the liposuction techniques in question within 21 days of Wilkins' service of her expert report," and that Lapuerta "failed to cure this deficiency" in his amended report.

Wilkins responds that "Marino did not renew her objection concerning Dr. Lapuerta's qualifications" in her objections to the amended report and her second motion to dismiss—the denial of which is the subject of this appeal. To the extent that Marino's inclusion of this argument in her brief can be read as a request for us to reverse the trial court's denial of her first motion to dismiss—in which she did include an objection to Lapuerta's qualifications—we lack jurisdiction over this issue for reasons previously explained. *Ogletree,* 262 S.W.3d at 321.

ages should be used or how long they should be applied, (2) Lapuerta's alleged failure to connect causally postoperative care and injury. *Cf. RGV Healthcare Assocs., Inc. v. Estevis,* 294 S.W.3d 264, 269–70 (Tex.App.-Corpus Christi 2009, pet. denied) (objection that expert report was conclusory did not preserve objection that report was insufficient as to causation, where conclusory objection referenced the wrong report and the facts it referenced were irrelevant to argument on appeal).

The trial court did not abuse its discretion by concluding that Marino waived her objection to Lapuerta's opinion that Wilkins's postoperative treatment breached the applicable standard of care and caused injury.

**C. The trial court did not abuse its discretion by concluding that Marino's objections to the portion of Lapuerta's report complaining that Marino was not qualified was waived.**

■ Lapuerta's other theory of liability that the trial court concluded that Marino failed to object to is that Marino's alleged lack of qualifications or skill to perform liposuction caused Wilkins's injury. Lapuerta's initial report and amended report contain identical recitations regarding this theory:

> *Standard of Care section:* "The standard of care calls for liposuction procedures to be performed by qualified and experienced plastic surgeons."
>
> *Breaches of Standard of Care section:* "I have grave doubts about Dr. Marino's qualifications to perform liposuction procedures. I do not know of any accredited hospital or outpatient surgical facility that would allow an OB/GYN physician to perform liposuction. It does not appear that she has any certification in plastic surgery or any particular experience in that area. Under the circumstances, her mere performance of this

procedure was a breach of the standard of care."

> . . . .
>
> "Both her approach to the procedure—aggressively resecting tissues in a single procedure—and her ultimate performance of that procedure were breaches of the standard of care."
>
> *Causation section:* "The over resection was itself breach of the standard of care and, I believe, resulted from the performance of the liposuction procedure by an unqualified surgeon."
>
> . . . .
>
> "Finally, I am concerned that an obstetrician and gynecologist who is not a qualified plastic surgeon is performing plastic surgery and body contouring on patients. . . . I believe this requires further investigation."
>
> *Conclusion section:* "In my opinion, this treatment of Ms. Wendy Wilkins violates the standard of care in the community in numerous breaches in the standard of care such as a gynecologist performing body contouring at weekly intervals on the patients. . . . These breaches caused the aforementioned damages to Ms. Wilkins and will require extensive additional treatment to correct, where correction is possible, at all."

Marino's objections to Lapuerta's initial report makes no reference to these allegations about Marino's alleged lack of qualifications. Marino's objections to Lapuerta's amended report references the "amended report['s] . . . broad statements that the standard of care was breached by [Marino's] alleged lack of qualifications to perform surgery" and asserts that "[t]he report does not state that these alleged breaches caused injury to" Wilkins.

Marino does not rely on her objections to the amended report here; instead, she

argues that Lapuerta's theory that she is an unqualified surgeon are inseparably linked to the other theories of liability such that no separate objection was required. She thus contends that by timely objecting to Lapuerta's assertions of negligence relating to Marino's approach to the procedures and her postoperative care, she implicitly objected to Lapuerta's qualification theory as well, as the assertion that she is unqualified, "standing alone, states no claim for medical negligence." Wilkins disagrees that her theories are inextricably linked, and further asserts that while Lapuerta could have expanded this theory in his amended report, "neither he nor Wilkins nor the trial court was made aware of any need to do so because of Dr. Marino's lack of objection."

We conclude the trial court did not abuse its discretion by finding that Marino waived her objection to Lapuerta's opinion that her alleged lack of qualifications to perform surgery caused Wilkins's injury. Section 74.351(r)(6) provides an expert report must contain expert's opinions on three statutory elements: standard of care, breach, and causation. *Palacios*, 46 S.W.3d at 877–78. Lapuerta's reports clearly articulate that Marino's lack of qualification as a plastic surgeon violated the applicable standard of care and that caused Marino's injury. Regardless of whether this theory is viable, Marino was required to object to this theory within twenty one days if her argument can serve as a basis to dismiss Wilkins's claims. *See Ogletree*, 262 S.W.3d at 318, 321–22 (rejecting hospital defendant's argument that no timely objection to nurses' expert reports implicating its conduct was required because only a physician can opine as to

causation such that the nurses' reports were "not merely deficient, but nonexistent").[5]

We overrule Marino's first issue.

## CONCLUSION

We affirm the trial court's denial of Marino's motion to dismiss.

---

5. Our opinion should not be read to endorse the viability of this theory, but only to hold that if a plaintiff's expert clearly articulates an allegedly invalid theory of liability in an expert report, the defendant must timely object to the report on that basis to obtain dismissal at that stage. Without such timely objection, the defendant will have to wait to until later in the proceedings—i.e., summary judgment or trial—to challenge that theory.