Marc W. Brown, Justice *386 These consolidated appeals pertain to a healthcare liability suit brought by appellees, Richard Ford and Raquel Gonzales, as wrongful-death beneficiaries of Desiree Ford, deceased, against appellants Michael V. Kelly, II, M.D., Compounding Plus LLC d/b/a Diamond Pharmacy, Tamara Mitchell, Joyce James, R.Ph., Christian Schwalm, and Diamond Pharmacy, LLC.[1] Kelly challenges the trial court's denial of his second motion to dismiss pursuant to section 74.351 of the Texas Medical Liability Act (the "Act"). The Diamond Pharmacy Parties challenge the trial court's denial of their respective motions to dismiss pursuant to section 74.351. Kelly and the Diamond Pharmacy Parties contend that the trial court abused its discretion by concluding that the plaintiffs' expert reports complied with section 74.351. Because the expert reports fail to satisfy the statutory requirements as to causation, we reverse the trial court's orders denying Kelly's and the Diamond Pharmacy Parties' motions to dismiss and render judgment dismissing Ford's and Gonzales's claims against Kelly and the Diamond Pharmacy Parties with prejudice. We remand for a determination of reasonable attorney's fees and costs.
I. BACKGROUND
On or about November 13, 2014, Desiree Ford, 22-year-old daughter of appellees Richard Ford and Raquel Gonzales (the "Ford parents"), obtained a prescription compounded cream containing the drugs ketamine and cyclobenzaprine. The prescription was written by Dr. Michael Kelly, and Diamond Pharmacy filled the prescription. Ford also obtained this compounded cream from Diamond Pharmacy for her father using a prescription signed by Kelly. That same day, Desiree sent a phone text stating, "whoa ... time for a shower, this lotion is making me feel weird." Desiree was found dead in her bathtub on November 17, 2014. The Harris County Institute of Forensic Sciences autopsy report concluded that the manner of Desiree's death was an accident and the cause of her death was toxic effects of ketamine and cyclobenzaprine.
In February 2016, the Ford parents sued Kelly; Compounding Plus LLC d/b/a Diamond Pharmacy; Mitchell and Schwalm, who owned the pharmacy; and James, who worked as the lead pharmacist. The Ford parents alleged claims of negligence, "vicarious liability/corporate veil," and gross negligence. On July 14, 2016, the Ford parents served Kelly, Compounding Plus, Mitchell, James, and Schwalm with expert reports prepared by Diane Ginsburg, R.Ph., and by Michael Dominguez, M.D., and with their CVs, pursuant to section 74.351 of the Act. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West 2017).
Kelly, Compounding Plus, Mitchell, James, and Schwalm timely objected to the expert reports as insufficient[2] and *387 moved to dismiss the Ford parents' suit pursuant to the Act. The Ford parents responded and moved for a 30-day extension to cure any deficiencies in the reports. The trial court held a hearing. On October 6, 2016, the trial court signed an order that sustained the objections to the qualifications of Dominguez to opine as to Desiree's cause of death and as to how the defendants' conduct proximately caused her death, sustained the objections to the sufficiency of Dominguez's opinions regarding Desiree's cause of death and as to how the defendants' conduct proximately caused her death, and granted the Ford parents a 30-day extension.[3]
On September 27, 2016, the Ford parents served Kelly, Compounding Plus, Mitchell, James, and Schwalm with an amended report prepared by Dominguez and with his CV. Kelly, Compounding Plus, Mitchell, James, and Schwalm timely objected to the amended expert report as insufficient.[4] On November 4, 2016, the Ford parents served these defendants with the same amended Dominquez report and CV, as well as with an expert report prepared by Jill Urban, M.D., and Urban's CV.
The Ford parents amended their petition to add Diamond Pharmacy, LLC, as a defendant.[5] On November 15, 2016, the Ford parents served the amended Dominguez report and the Urban report and their CVs on Diamond Pharmacy, LLC. The Ford parents also re-served these reports on Kelly, Compounding Plus, Mitchell, James, and Schwalm. Kelly, Compounding Plus, Mitchell, James, and Schwalm timely objected to Urban's expert report as insufficient and again moved to dismiss the Ford parents' suit pursuant to the Act.[6] Diamond Pharmacy, LLC, also timely objected to the amended Dominquez report and the Urban report, and moved to dismiss the Ford parents' suit pursuant to the Act.[7] The Ford parents responded and moved for another 30-day extension to cure any deficiencies in the reports. The trial court held a hearing, and in an order signed March 3, 2017, overruled the objections of Kelly, Compounding Plus, Mitchell, James, and Schwalm and denied the motions to dismiss of Kelly, Compounding Plus, Mitchell, James, and Schwalm. The trial court's order did not state that it was overruling the objections *388 and denying the motion to dismiss of Diamond Pharmacy, LLC.
On March 9, 2017, the Ford parents served Kelly and the Diamond Pharmacy Parties with an amended expert report prepared by Ginsburg and Ginsburg's CV. The Diamond Pharmacy Parties promptly objected to the amended Ginsburg report as untimely.[8] The Ford parents responded. On June 6, 2017, the trial court signed an order sustaining the objections that the amended Ginsburg report was untimely[9] and denying Diamond Pharmacy, LLC's motion to dismiss.
Kelly and the Diamond Pharmacy Parties timely appealed. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(9) (West 2015 & Supp. 2017).
II. ANALYSIS
Kelly brings two related issues. In his first issue, Kelly argues that the trial court abused its discretion in denying his second motion to dismiss. Second, he contends the trial court abused its discretion in finding Dominguez's and Urban's expert opinions that the ketamine and cyclobenzaprine compounded cream prescribed by Kelly caused Desiree's death were sufficient because they are conclusory, not linked to facts, and are based on speculation and unsupported assumptions. The Diamond Pharmacy Parties bring three issues: first, they argue that the Dominguez and Urban expert reports fail to comply with the Act as to causation; second, they contend that the reports fail to comply with the Act because the experts are not qualified in the field of toxicology; and third, they argue that they should be awarded their attorney's fees on remand.[10]
The Ford parents respond that Kelly and the Diamond Pharmacy Parties have failed to demonstrate the trial court abused its discretion in finding the Dominguez and Urban expert reports constituted good-faith efforts to comply with the Act.
A. Standard of review
We review a trial court's ruling on the adequacy of an expert report under the Act for an abuse of discretion. Van Ness v. ETMC First Physicians , 461 S.W.3d 140, 142 (Tex. 2015) (per curiam); Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios , 46 S.W.3d 873, 877 (Tex. 2001). The trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. Bowie Mem'l Hosp. v. Wright , 79 S.W.3d 48, 52 (Tex. 2002) (per curiam); Lucas v. Clearlake Senior Living Ltd. P'ship , 349 S.W.3d 657, 660 (Tex. App.-Houston [14th Dist.] 2011, no pet.). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. Wright , 79 S.W.3d at 52 ; Lucas , 349 S.W.3d at 660.
B. Expert-report requirements
Under the Act, a plaintiff asserting negligence by a healthcare provider must timely serve on each defendant an expert report that provides a fair summary of the expert's opinions as of the date of the report regarding: (1) the applicable standards *389 of care; (2) the manner in which the care rendered by the physician or healthcare provider failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (r)(6) ; Wright , 79 S.W.3d at 51. In Palacios , the Supreme Court of Texas explained that when considering a motion to dismiss a healthcare-liability claim because of insufficient expert reports, "[t]he issue for the trial court is whether 'the report' represents a good-faith effort to comply with the statutory definition of an expert report." 46 S.W.3d at 878.
To constitute a "good-faith effort," a report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question and (2) it must provide a basis for the trial court to conclude that the claims have merit. Id. at 879 ; Gannon v. Wyche , 321 S.W.3d 881, 889 (Tex. App.-Houston [14th Dist.] 2010, pet. denied). The report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute: standard of care, breach, and causation. Palacios , 46 S.W.3d at 878-79.
A compliant report must include an explanation of the basis for the expert's statements and link his conclusions to the facts. Wright , 79 S.W.3d at 52 ; Gannon , 321 S.W.3d at 897. A report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements. Palacios , 46 S.W.3d at 879 ; see Wright , 79 S.W.3d at 53.
If a report is served, then "[e]ach defendant physician or health care provider whose conduct is implicated ... must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). If an expert report has not been properly served "because elements of the report are found deficient, then the court may grant one 30-day extension to the claimant in order to cure the deficiency." Id. § 74.351(c).
A trial court must grant a motion to dismiss a plaintiff's suit if it appears to the court that the expert report does not represent an objective good-faith effort to comply with the definition of an expert report. Id. § 74.351(l), (r)(6). If a compliant expert report is not timely served, then the trial court "shall" dismiss the claim with prejudice and "shall" award reasonable attorney's fees and costs to the defendant. Id. § 74.351(b) ; Fox v. Hinderliter , 222 S.W.3d 154, 157-58 (Tex. App.-San Antonio 2006, pet. struck) ("The language of the statute is mandatory, and the dismissal and award of attorney's fees and costs go hand in hand."). To determine the adequacy of the report, the trial court should look no further than the report itself because all the information relevant to the inquiry is contained within the document's four corners. Palacios , 46 S.W.3d at 878.
C. Causation
Kelly and the Diamond Pharmacy Parties contend that the trial court abused its discretion in denying their section-74.351 motions to dismiss because Dominguez's and Urban's expert opinions on causation[11] are conclusory, speculative, and *390 mere conjecture. Both Kelly and the Diamond Pharmacy Parties argue the reports fail to explain why they should have foreseen that prescribing or dispensing the compounded cream to Desiree would proximately cause her death.
Claims arising from prescribing and dispensing compounded prescription drugs[12] generally are subject to the Act. See Randol Mill Pharmacy v. Miller , 465 S.W.3d 612, 615-16, 623 (Tex. 2015). With regard to causation, an expert report must explain, to a reasonable degree of medical probability, how and why the alleged negligence caused the complained-of injury. See Jelinek v. Casas , 328 S.W.3d 526, 536 (Tex. 2010). "An expert report prepared pursuant to the Act may not have an 'analytical gap' or a 'missing link' between the expert's allegation that the healthcare provider defendant breached the standard of care and the plaintiff's injuries." Humble Surgical Hosp., LLC v. Davis , 542 S.W.3d 12, No. 14-16-01026-CV, 2017 WL 4679280, at *8, 10 (Tex. App.-Houston [14th Dist.] Oct. 17, 2017, no pet. h.) (concluding that expert's "opinion on causation contains analytical gaps and missing links which render his opinion conclusory"). Courts cannot fill in missing gaps in a report by drawing inferences or resorting to guess work. See Wright , 79 S.W.3d at 53.
The causal relationship required in a healthcare-liability claim is proximate cause. See Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13) (West 2017) (defining "health care liability claim" as cause of action for physician's or healthcare provider's breach of standard of care "which proximately results in injury to or death of a claimant"). Although the report need not use "proximate cause," "foreseeability," or "cause in fact" as "magical words," to satisfy the Act's requirements and show "how and why a breach of the standard of care caused injury, the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven." Columbia Valley Healthcare Sys., L.P. v. Zamarripa , 526 S.W.3d 453, 460 (Tex. 2017). Without factual explanations, reports amount to "nothing more than the ipse dixit of the experts," which the Texas Supreme Court holds are "clearly insufficient." Id. at 461.
Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. Id. Accordingly, an expert report under the Act must explain both foreseeability and cause-in-fact. See Miller v. JSC Lake Highlands Operations, LP , 536 S.W.3d 510, No. 16-0986, 2017 WL 6391215, at *4 (Tex. Dec. 15, 2017) (citing Zamarripa , 526 S.W.3d at 460 ). A healthcare provider's breach was a foreseeable cause of the plaintiff's injury if a healthcare provider of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. See Price v. Divita , 224 S.W.3d 331, 336 (Tex. App.-Houston [1st Dist.] 2006, pet. denied) (citing *391 Doe v. Boys Clubs of Greater Dallas, Inc. , 907 S.W.2d 472, 478 (Tex. 1995) ). For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission-i.e., but for the act or omission-the harm would not have occurred. Zamarripa , 526 S.W.3d at 460.
D. Dominguez's report
In his report, Dominguez lists the records that he reviewed to form his opinions.[13] Dominguez describes his familiarity and experience with prescribing ketamine and cyclobenzaprine. He provides a "Case review," including the following details:
• that Kelly pre-signed prescriptions for a compounded cream containing some combination of ketamine and cyclobenzaprine and provided them to Diamond Pharmacy;
• that Kelly did not properly take Desiree's history or examine her and his provided records do not meet the minimum standard of care for charting;
• that Desiree's history included ADHD, bipolar disorder, depression, HIV infection, and drug use;
• that Desiree was involved in signing people up to receive compounded pain creams, including her father, and was to be paid $100 per sign-up;
• that Desiree filled prescriptions for herself and her father for the compounded cream at Diamond Pharmacy;
• that Desiree applied the cream to herself in some fashion, in some amount, possibly from three bottles, the same day she filled the prescriptions;
• that she subsequently felt "weird";
• that four days later she was found dead in her bathtub; and
• that the autopsy attributed her death to "toxic effects of ketamine and cyclobenzaprine."
Dominguez next describes the standard of care for prescribing medications-performing an appropriate history and physical exam of the patient and prescribing the medication for a specific current condition. He states that Kelly breached this standard. Dominguez also states that the standard of care for prescribing class III drugs like ketamine requires at least one in-person consultation and a therapeutic indication. Dominguez states that Kelly breached this standard where Desiree did not see him prior to receiving the combination cream prescription, and where she had no history of chronic musculoskeletal pain and no history of intolerance to oral analgesics. Dominguez states that the standard of care requires physicians to keep control of their prescription pads and not provide pre-signed prescriptions to anyone. According to Dominguez, Kelly breached this standard by pre-signing prescriptions and providing them to Diamond Pharmacy.[14]
*392 Within the "Causation" section of his report, Dominguez states that he is familiar with the "pharmacological effects" of ketamine and cyclobenzaprine"taken in therapeutic and non-therapeutic doses." Dominguez states that he is "familiar with the effects of toxic drug combination overdose deaths" and has "had numerous patients in private practice that have died due to toxic effects of drug combinations." Dominguez also states that he is "familiar with the manner in which a drug overdose occurs and the physiological effects on the body as a result." Dominguez discusses his work with medical examiners to establish cause of death following autopsies, what input he provides to medical examiners regarding his patients, and his review of toxicological studies and autopsies to provide "comment and input as to the final cause of death." Dominguez describes the drugs at issue:
Ketamine is primarily used to start and maintain anesthesia. Heart function, breathing, and airways remain functional but are still effected [sic]. In the presence of co-morbidities and/or excessive dosages, the drug can lead to respiratory depression which slows breathing to the point of death.
Cyclobenzaprine is a muscle relaxant used to relive [sic] muscle spasms. In conjunction with other central nervous system depressants, such as ketamine, it can lead to respiratory depression which slows the breath to the point of death.
The combination of cyclobenzaprine and ketamine can lead to respiratory depression which causes death. This would be considered a toxic effect of the combination of the medications.
Dominguez states that "[f]ollowing use of the combination cream from Diamond Pharmacy, Ms. Ford was reported to state that it was making her feel 'weird.' " He states that hallucinations and dissociative states are side effects of ketamine. Dominguez states that Desiree was found dead in the bathtub with "three bottles of the combination cream with ketamine/cyclobenzaprine from Diamond Pharmacy" "nearby"; the three bottles were prescribed by Kelly, with one in Desiree's name and two in her father's name. Dominguez concurs with the autopsy report, which "revealed the presence of the ketamine and cyclobenzaprine" and established the cause of death as an accident "from the toxic effects of ketamine and cyclobenzaprine." Dominguez then provides the crux of his causation opinions:
Ms. Ford died from the use of the compound cream prescribed by Dr. Kelly and dispensed by Diamond Pharmacy. There is some suggestion that Ms. Ford might have rectally inserted the cream, but that is not germane to how she died. Whatever method of administration, there is no doubt that the cause of death was the ketamine and cyclobenzaprine in the cream. The combination of these medications led to respiratory depression and eventually death in this patient.
Ms. Ford should not have been prescribed or dispensed this cream in any dosage, amount or manner of use whatsover [sic]. There were no therapeutic indications and no use of the medication would benefit her. As a mentally ill young woman with a history of drug use, it was foreseeable that she would either expire from the medication as prescribed or use it in a manner (such as rectally or in greater than prescribed doses) that would lead to respiratory depression and death. Under either scenario, it was the medication that caused her death and she never should have been prescribed or dispensed the medication.
*393 Without the medication, then Desiree Ford would not have had the medication and would not have been able to accidently [sic] overdose with the ketamine and cyclobenzaprine in November 2014.
If Dr. Michael Kelly had not written a prescription for a compounded, combination pain cream for Ms. Desiree Ford inappropriately, Ms. Ford would not have died from the toxic effects of the combination pain cream.
In my opinion, based on my experience and training, it is certain within a reasonable degree of medical probability that the actions and failures of Dr. Michael Kelly led to the premature death of Ms. Desiree Ford.
In the same manner as stated above, the fact that [sic] had Diamond Pharmacy and Joyce Ann James, R.Ph. not manufactured and dispensed the combination cream to Ms. Ford, it is certain within a reasonable degree of medical certainly that she would not have died from the toxic effects of the combination pain cream. If Diamond Pharmacy and Joyce Ann James, R.Ph. had not dispensed the medication to Ms. Ford, then she would not have been in possession of the medication in November, [sic] 2014. If she had not been in possession of the ketamine and cyclobenzaprine, then she would not have been able to use the medication and would not have had an accidental overdose of the medication. It is my opinion that within a reasonable degree of medical certainty that the use of this cream resulted in Ms. Ford's premature death. In my opinion, based on my experience and training, it is certain within a reasonable degree of medical probability that the actions and failures of Diamond Pharmacy and Joyce Ann James, R.Ph. led to the premature death of Ms. Desiree Ford.
We recognize that Dominguez was not required to provide an exhaustive, lengthy summary of how Kelly's and the Diamond Pharmacy Parties' acts and omissions caused Desiree's accidental death. See Smith v. Wilson , 368 S.W.3d 574, 578-79 (Tex. App.-Austin 2012, no pet.) ; see also HEB Grocery Co., L.L.P. v. Farenik , 243 S.W.3d 171, 176 (Tex. App.-San Antonio 2007, no pet.) (plaintiffs are not required to present evidence in report as if actually litigating merits of case). Nor, had he even examined any of Desiree's actual medical records,[15] was Dominguez required to provide an exhaustive or lengthy summary of what aspects of her records led Dominguez to conclude that the compounded cream was an inappropriate and dangerous prescription. See Smith , 368 S.W.3d at 579. However, the report must show Dominguez is of the opinion that Desiree's death was proximately caused by Kelly's and the Diamond Pharmacy Parties' failures to meet the applicable standards of care. See Zamarripa , 526 S.W.3d at 460.
For ketamine, the only contraindications noted by Dominguez are bipolar disorder and a history of drug use.[16] Although Desiree apparently had both, Dominguez points to nothing linking those conditions to the cause of her death. Although Dominguez says that people with bipolar disorder *394 and a history of drug use are more likely to use the compounded cream rectally, he does not conclude that Desiree did so and, in any event, he affirmatively states that whether she used the cream rectally was not germane to her death. Dominguez additionally says that this population is more likely to take greater doses than prescribed, but he essentially moots that statement by saying that the compounded cream would have killed Desiree even if taken as prescribed. According to Dominguez, Desiree would have died "[u]nder either scenario." He therefore does not determine whether Desiree used more than the prescribed amount of the compounded cream.[17]
This leaves us with nothing more than Dominguez's conclusions that ketamine and cyclobenzaprine can cause death; that these substances did cause Desiree's death; and that Kelly's and the Diamond Pharmacy Parties' breaches of their respective standards of care gave Desiree access to these substances. Those statements may show "but-for" causation but do not explain why, at the time the respective standards of care were breached, it was foreseeable the breaches posed an excessive risk that Desiree would suffer an adverse result of the kind which actually occurred. That outcome might be foreseeable if ketamine and cyclobenzaprine should never be combined, or if Kelly prescribed or the Diamond Pharmacy Parties dispensed them in a dangerously high amount, or if a history of bipolar disorder or of drug use increased the likelihood of severe respiratory depression, or if Desiree had a previous adverse reaction to these drugs-but Dominguez says none of these things. Given that Dominguez admits having prescribed both drugs, there would seem to be some amount he considers safe to prescribe, but he does not state the amount at which severe respiratory depression becomes foreseeable, or that administering the drugs in a topical cream makes such a result foreseeable, or that Kelly prescribed or the Diamond Pharmacy Parties dispensed a dangerously high dosage, or that Desiree foreseeably used a dangerously high dosage, or that, even though an appropriate topical dosage was prescribed and dispensed, Desiree foreseeably used a different method of administering the compounded cream which dangerously increased her body's absorption of ketamine and cyclobenzaprine.
In sum, Dominguez does not deny that ketamine and cyclobenzaprine can be prescribed or dispensed together, or that Kelly prescribed and the Diamond Pharmacy Parties dispensed the compounded cream in a dosage within acceptable limits, or that Desiree used only the prescribed amount of the cream. The mere fact that Desiree died after using the compounded cream does not show such a result was foreseeable. See Husain v. Petrucciani , No. 14-10-00817-CV, 2011 WL 3449497, at *4 (Tex. App.-Houston [14th Dist.] Aug. 9, 2011, no pet.) (mem. op.) ("[F]oreseeability is not judged in hindsight." (citing Doe , 907 S.W.2d at 478 )). Every drug has contraindications *395 and possible adverse effects, but because proximate cause is the standard, an expert report needs to point to some facts showing the claimant could prove that, at the time of the breach, it was foreseeable that an adverse effect of the kind actually suffered would materialize in this patient. See Smith , 368 S.W.3d at 578-79 (expert report failed to provide facts explaining causal link between prescribing of fluoxetine (Prozac ) and particular patient's suicide). Were it otherwise, doctors and pharmacists essentially would be strictly liable for any adverse result from a patient taking an improperly prescribed or dispensed medication.
We therefore conclude that Dominguez's report does not provide a fair summary of the causal link between Desiree's death and Kelly's and the Diamond Pharmacy Parties' actions and omissions in prescribing and dispensing the compounded cream containing ketamine and cyclobenzaprine.
E. Urban's expert report
We next consider whether Urban's expert report otherwise fulfills section 74.351 's causation requirement. We conclude that it does not.
In her report, Urban lists the records that she reviewed to form her opinions.[18] She describes her qualifications as a physician and forensic pathologist. According to Urban's "Summary":
Ketamine is used as an anesthetic induction agent, and has recently received attention as a drug of abuse for is [sic] hallucinogenic side effects. Reactions to ketamine include hallucinations, delirium, irrational behavior, blurred vision, nausea, vomiting, respiratory stimulation or depression, tachycardia or bradycardia, hypertension or hypotension, seizures and cardiac arrhythmia. Ketamine has been identified as a causative agent of drug deaths.
Cyclobenzaprine is a tricyclic compound that is a centrally acting skeletal muscle relaxant. Overdosage can cause confusion, hallucinations, agitation, fever, hypotension, convulsions, coma, and cardiac arrhythmia. Elevated cyclobenzaprine has been identified as a causative agent in drug deaths.
Urban next provides a review of the autopsy report and opines that Desiree's autopsy was performed in accordance with governing forensic standards. Ketamine was present in the liver sample, while cyclobenzaprine was present in the blood sample from the heart. According to Urban: "Everything except the toxic effects of ketamine and cyclobenzaprine were [sic] excluded as possible causes of death in this case. I am in agreement with [the medical examiner's] determination of cause of death as the toxic effects of ketamine and cyclobenzaprine."
Within the "Discussion" section of her report, Urban provides excerpts from Forensic Toxicology: A Physiologic Perspective by David Dolinak, M.D. It appears Urban was attempting to explain that the decomposition of a body can affect drug concentrations and so sometimes toxicological results are reported qualitatively, not quantitatively. Urban then provides the crux of her causation opinion:
In the present case, Ms. Ford had no lethal natural disease. There is no evidence of injury. She was complaining of medication side effects prior to her death. Ketamine and cyclobenzaprine were detected in her body by postmortem toxicology. The determination that toxicological agents caused her death is both a diagnosis of exclusion, in that all other possible contributing factor are excluded, *396 and a diagnosis of inclusion, as ketamine and cyclobenzaprine are detected by postmortem toxicology in samples collected from her body at the time of autopsy, in addition to the pulmonary edema found at the time of autopsy. As all other possible causes of death are excluded, the combination of ketamine, cyclobenzaprine, and pulmonary edema being present establishes, within a reasonable degree of medical probability, that Ms. Ford died from the toxic effect [sic] of ketamine and cyclobenzaprine.
CONCLUSION
It is my opinion, to a reasonable degree of medical certainty, that the cause of death of Desiree Alex Ford is the toxic effects of ketamine and cyclobenzaprine. In the absence of natural disease or injury, within a reasonable degree of medical probability, the presence of ketamine, cyclobenzaprine and pulmonary edema establishes that the toxic effects of ketamine and cyclobenzaprine are more likely than not to have caused her death.
"In essence, [Urban's] report is a second autopsy report, opining about the cause of [Desiree's] death without explaining who caused it or how." See Bogar v. Esparza , 257 S.W.3d 354, 364, 368-69 (Tex. App.-Austin 2008, no pet.) (expert report was insufficient as to causation where it merely opined about cause of patient's death without explaining who caused it or how). Like Dominguez, Urban fails to provide any information about the specific dosages prescribed, whether acceptable or dangerous, or about the amount of the compounded cream that Desiree used prior to her death other than it was toxic. Urban also fails to explain how any of the actions of Kelly or the Diamond Pharmacy Parties in prescribing or dispensing the cream foreseeably resulted in Desiree's death.
We also conclude that Urban's report does not provide a fair summary of the causal link between Kelly's and the Diamond Pharmacy Parties' actions and omissions in prescribing and dispensing the compounded cream containing ketamine and cyclobenzaprine and Desiree's death. Therefore, because the Ford parties failed to provide expert reports that complied with the requirements of the Act, the trial court abused its discretion by denying Kelly's and the Diamond Pharmacy Parties' respective motions to dismiss. We sustain both of Kelly's issues and the Diamond Pharmacy Parties' first and third issues.[19]
F. Remand request as to Diamond Pharmacy, LLC
In their supplemental brief, the Ford parents request that, if we sustain any of the issues of Diamond Pharmacy, LLC, then we consider remanding for the trial court to consider whether the deficiency can be cured and whether to grant an extension of time as to Diamond Pharmacy, LLC. The Ford parents have not presented, nor have we located, any authority that requires us to remand for the trial court to consider granting such an extension. The trial court already had granted the Ford parents one 30-day extension to cure the causation deficiencies in their expert reports as to Compounding Plus LLC d/b/a Diamond Pharmacy, and as to the other pharmacy defendants, but the Ford parents failed to do so. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c) (providing that "the court may grant one 30-day extension to the claimant in order *397 to cure the deficiency"). The Ford parents have not brought any separate or distinct allegations with regard to causation against Diamond Pharmacy, LLC, as opposed to the other pharmacy defendants. Moreover, because the Ford parents did not appeal the untimeliness of the amended Ginsburg report and the Ford parents never served the original Ginsburg report on Diamond Pharmacy, LLC, they failed to serve an expert report on Diamond Pharmacy, LLC, that addresses the other elements of standard of care and breach required by the Act. We deny the Ford parents' request to remand.
III. CONCLUSION
Accordingly, we reverse the trial court's orders denying Kelly's and the Diamond Pharmacy Parties' respective motions to dismiss and remand this cause to the trial court for rendition of judgment dismissing the Ford parties' claims against Kelly and the Diamond Pharmacy Parties with prejudice and for a determination of reasonable attorney's fees and costs. See itation index="48" url="https://cite.case.law/citations/?q=Tex.%20Code%20Ann.%20%C2%A7%2074.351">id. § 74.351(b).

Where appropriate, we collectively refer to Compounding Plus LLC d/b/a Diamond Pharmacy, Mitchell, James, Schwalm, and Diamond Pharmacy, LLC, as the "Diamond Pharmacy Parties."

Kelly, Compounding Plus, Mitchell, James, and Schwalm objected to Dominquez's qualifications to opine and to his conclusory opinions on causation. In addition, Compounding Plus, Mitchell, James, and Schwalm objected to Ginsburg's conclusory opinions on therapeutic indication, reasonable dosage, and the pharmacist standard of care. Compounding Plus, Mitchell, and Schwalm also objected to Ginsburg's qualifications to opine on the standard of care for compounding pharmacies.

Neither this order nor any other order in the record appears to provide a ruling on the objections lodged against Ginsburg's original report; however, no party appeals this issue. A pharmacist is not qualified to opine on medical causation. See Tex. Civ. Prac. & Rem. Code §§ 74.351(r)(5)(C), 74.403(a) ; Rodriguez v. Walgreen Co. , No. 03-14-00765-CV, 2016 WL 368772, at *3 (Tex. App.-Austin Jan. 27, 2016, no pet.) (mem. op.); Walgreen Co. v. Hieger , 243 S.W.3d 183, 186 n.2 (Tex. App.-Houston [14th Dist.] 2007, pet. denied) (not considering report by Ginsburg as to causation).

Kelly, Compounding Plus, Mitchell, James, and Schwalm objected to Dominquez's qualifications to opine and to his conclusory opinions on causation.

The Ford parties also added Natasha Cleveland as a defendant; Cleveland is not a party on appeal.

Kelly, Compounding Plus, Mitchell, James, and Schwalm all objected to Urban's conclusory opinions on causation. All these defendants except Kelly also objected to Urban's qualifications to opine on causation.

Diamond Pharmacy, LLC, objected to Dominguez's qualifications to opine and to his conclusory opinions on causation, and to Urban's qualifications to opine and to her conclusory opinions on causation. In the same filing, Compounding Plus, Mitchell, and Diamond Pharmacy, LLC, raised their objections, with Compounding Plus and Mitchell submitting their first amended motion and Diamond Pharmacy, LLC, submitting its original motion to dismiss.

Additionally, James filed a motion to dismiss and Compounding Plus, Mitchell, and Diamond Pharmacy, LLC, filed a supplemental motion to dismiss.

The Ford parents have not included this issue in any cross-appeal. And, as previously stated, a pharmacist is not qualified to opine on medical causation. See supra n.3.

Kelly does not include a separate issue as to attorney's fees but in his prayer expressly requests that this court remand the cause for further proceedings regarding attorney's fees and costs to be awarded to him under section 74.351(b).

According to Dominguez's report, Kelly breached the applicable standards of care by pre-signing prescriptions and providing them to Diamond Pharmacy, and by prescribing ketamine to Desiree without performing a history and medical exam. According to Ginsburg's original report, Diamond Pharmacy and James breached the applicable standards of care by manufacturing and dispensing the non-FDA-approved combination cream containing ketamine and cyclobenzaprine. No party on appeal challenges the expert reports as to the applicable standards of care or breaches.

"Generally, drug compounding is the process by which a pharmacist mixes or alters drugs to create a medication that is tailored to the needs of an individual patient and that is not otherwise commercially available." Randol Mill Pharmacy v. Miller , 465 S.W.3d 612, 617-18 (Tex. 2015). "[C]ompounded drugs may not be given to a patient absent a doctor's order." Id. at 620.

Dominguez listed the autopsy, police report, "Info on Diamond Pharmacy Pain Cream," death certificate, "FDA Report," Ginsburg's report, Kelly's purported medical records of Desiree and her father, affidavit of Richard Ford from Health and Human Services, and identification cards for Desiree and her father.

Dominguez does not opine on the pharmacist standard of care or the Diamond Pharmacy Parties' alleged breaches. According to Ginsburg's original report, not contested on appeal, the pharmacist standard of care requires performing a review of the patient's medication record to promote therapeutic appropriateness, and manufacturing and dispensing only FDA-approved medications. Diamond Pharmacy and James allegedly breached the standard of care by not performing this review for Desiree's prescription, and by manufacturing and dispensing the non-FDA-approved combination cream containing ketamine and cyclobenzaprine.

Dominguez only reviewed Desiree's "purported" medical records from Kelly. At least one court of appeals has concluded that a physician's expert report was conclusory as to causation and did not set forth a specific link between a defendant doctor's alleged omissions with a plaintiff patient's alleged injuries where the physician expert failed to state that she reviewed the patient's pertinent medical records. See Diagnostic Research Grp. v. Vora , 473 S.W.3d 861, 873 (Tex. App.-San Antonio 2015, no pet.).

Dominguez does not provide any contraindications for cyclobenzaprine.

Dominguez provides no details about the specific dosages of the ketamine and cyclobenzaprine in the compounded cream prescribed by Kelly and dispensed by the Diamond Pharmacy Parties to help explain why they contributed to Desiree's death. Texas courts have found expert reports deficient as to causation under similar circumstances. See HEB Grocery Co. v. Galloway , No. 09-13-00486-CV, 2014 WL 2152128, at *6 (Tex. App.-Beaumont May 22, 2014, no pet.) (mem. op.) (Ketoconazole dispensed instead of Coreg as prescribed); Gingrich v. Scarborough , No. 09-09-00211-CV, 2010 WL 1711067, at *3 (Tex. App.-Beaumont Apr. 29, 2010, no pet.) (mem. op.) (Lorcet, Soma, and Xanax ); Collini v. Pustejovsky , 280 S.W.3d 456, 467 (Tex. App.-Fort Worth 2009, no pet.) (Reglan ).

Urban listed the autopsy, death certificate, Dominguez's report, and Ginsburg's report.

Because Kelly and the Diamond Pharmacy Parties all raised the insufficiency of Dominguez's and Urban's expert opinions on causation, which we have concluded is dispositive, we need not reach the Diamond Pharmacy Parties' second issue related to the lack of toxicology qualifications of Dominguez and Urban. See Tex. R. App. P. 47.1.